# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BRUCE W. ANDERSON,

        *Plaintiff-Appellant,*

        v.

SUBURBAN TEAMSTERS OF NORTHERN
ILLINOIS PENSION FUND BOARD OF
TRUSTEES, in its capacity as
Administrator of the Suburban
Teamsters of Northern Illinois
Pension Plan; SUBURBAN
TEAMSTERS OF NORTHERN ILLINOIS
PENSION PLAN,

        *Defendants-Appellees.*

No. 07-15532

D.C. No.
CV-05-01377-DGC

OPINION

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted
September 14, 2009—San Francisco, California

Filed December 1, 2009

Before: Stephen S. Trott and Carlos T. Bea, Circuit Judges,
and Suzanne B. Conlon,* District Judge.

Opinion by Judge Trott

---

*The Honorable Suzanne B. Conlon, United States District Judge for
the Northern District of Illinois, sitting by designation.

15639

## COUNSEL

Andrea A. Ambrose and Colin B. Vandell, Latham & Watkins LLP, Los Angeles, California, for the plaintiff/appellant.

Barry G. Collins, Asher, Gittler, Greenfield & D'Alba, Ltd., Chicago, Illinois, for the defendants/appellees.

## OPINION

TROTT, Circuit Judge:

Bruce Anderson appeals the district court's determination, following a bench trial, that the Suburban Teamsters of Northern Illinois Pension Fund Board of Trustees ("the Trustees")

did not abuse their discretion in partially denying his claim for disability benefits pursuant to a plan maintained under the Employee Retirement Income Security Act ("ERISA"). In the past, the Plan specified one way to calculate disability benefits. Before Anderson applied for benefits, the Plan was amended to change the formula for calculating benefits depending on the date the employee became disabled. Anderson claims the Trustees improperly determined the date of his disability, resulting in a lower benefit. Anderson claims also that if the Trustees appropriately determined the date of his disability, then the 1999 amendment violates ERISA's anti-cutback rule. Finally, Anderson claims the Trustees improperly applied a Qualified Domestic Relations Order ("QDRO"), allocating half of his pre-divorce disability benefits to his ex-wife. We affirm.

# I

## BACKGROUND

For much of his life, Anderson worked as a mechanic. In July 1996, Anderson suffered an on-the-job knee injury that required surgery. In December 2006, Anderson was diagnosed with osteoarthritis. In addition to his bad knee, Anderson suffers from degenerative disk disease, carpal tunnel syndrome, tinnitus, depression, and bone spurs in his shoulders.

Believing that he might be able to find a job that would allow him to work despite his injury, Anderson went to school from 1997 to 2001 and did not work. He earned a degree in Business Administration and hoped to work in the computer field.

Anderson and his wife divorced in 1999. The QDRO entered in the Andersons' state court divorce proceeding provided that Anderson's ex-wife was to receive the actuarial equivalent of fifty percent of Anderson's accrued pension as

of February 25, 1999. The payments to Anderson's ex-wife were to begin "at her election following the Participant attaining his earliest retirement age as defined by the Plan."

Unable to find a job in the computer field, Anderson went back to union employment in 2001. From June to October, he worked fifty-one days as a truck driver. Finding himself unable to continue to perform this work because of his pain, Anderson stopped working and has not worked since. In August 2003, Anderson applied to the Suburban Teamsters of Northern Illinois Pension Fund ("the Fund") for disability benefits under its pension plan ("the Plan"). The applicable version of the Plan at that time was the Plan as amended on January 1, 1999 ("1999 Plan").

The Fund is a multi-employer benefit trust fund. Participating employers contribute to the Plan pursuant to various collective bargaining agreements. The Board of Trustees — which administers the Plan — is made up of both employer and employee representatives.

The Plan provides for several different types of pensions. For example, an employee might be eligible for a Normal Retirement Pension under § 5.01, an Early Retirement Pension under § 5.02, a 30-Year Pension under § 5.03, or a "25 and Out" Pension under § 5.06.

In addition to these types of pensions, Article 6 of the Plan provides disability benefits — called a "disability retirement pension" — for employees who become "totally and permanently disabled." The Plan defines "totally and permanently disabled" as follows:

> A Participant shall be considered totally and permanently disabled only if he suffers from a physical or mental condition which will continue for a long and indeterminate period of time and which will prevent him from pursuing any and all gainful occupations

and from performing any work for compensation or benefit during that period of time.

1999 Plan, § 6.03.

The Plan calculates benefits based on Benefit Credits participants earn during their employment. Normally, an employee receives Benefit Credits only for periods when the employee actually works. However, before the Plan was amended in 1999, employees were covered by the 1995 version of the Plan ("1995 Plan"). Under the 1995 Plan, if an employee became disabled,

> [t]he amount of such Disability Retirement Benefit shall be equal to 100% of the amount of Age Retirement Benefit to which the Participant would be entitled at his Normal Retirement Age, calculated as if he remained in Covered Employment continuously from the onset of his total and permanent disability until his Normal Retirement Age, except that with respect to a Participant whose Disability Retirement Benefit becomes effective on or after April 1, 1977, each payment prior to his Normal Retirement Age shall be equal to 75% of such Age Retirement Benefit, increasing to 100% of such Age Retirement Benefit at the Participant's Normal Retirement Age.

1995 Plan, § 6.02 (emphasis added). Thus, the disabled employee was allocated Benefit Credits for future years even though the employee would not be working.

The 1999 Plan, in contrast, contains two different ways to calculate a disability benefit. If an employee became disabled prior to May 1, 1998, the employee's benefit would be determined using the same calculation described above: the employee would receive extra Benefit Credits for years not actually worked. 1999 Plan, § 6.02(b).

If, however, an employee became disabled after May 1, 1998, the disability benefit would be equal to "100% of the amount of Age Retirement Benefit to which the Participant would be entitled at his Normal Retirement Age, *based on Benefit Credits actually earned*." 1999 Plan, § 6.02(a) (emphasis added). Under this formula, the employee would not receive any extra Benefit Credits for future years of unemployment due to disability.

Anderson claimed he was disabled as of June 1, 1997. The Trustees, however, determined that Anderson was totally and permanently disabled as of November 2001 and partially denied his application. The Trustees informed Anderson they could not "reconcile a disability date prior to November 2001 with the fact that you worked for a significant period from June through October 2001." Because Anderson became disabled after May 1, 1998, the Trustees applied § 6.02(a) of the 1999 Plan instead of § 6.02(b). Anderson's disability benefit was based only on those Benefit Credits he actually earned while he was working. Anderson earned 11.3 Benefit Credits before 1997 and 0.3 Benefit Credits in 2001. Based on this number of Benefit Credits, the Trustees found that the amount of Anderson's disability benefit was $878.08 per month. This amount consisted of $869.31 attributable to his pre-1997 employment, and $8.77 attributable to his 2001 employment.

The Trustees then applied Anderson's QDRO to divide Anderson's portion and his ex-wife's portion of his benefits. They split the $869.31, which accrued while Anderson was married, by fifty percent. Anderson was therefore entitled to $434.66 (half of the amount attributable to his pre-divorce employment) plus the $8.77 from his 2001 employment, for a total monthly benefit of $443.43.

Anderson appealed the partial denial of his claim, as well as the QDRO reduction, but the Trustees came to the same conclusion on appeal. Anderson then filed a complaint in the Arizona District Court. After a bench trial, the district court

entered judgment in favor of the Trustees. The court also denied Anderson's motion for a new trial. Anderson timely appealed to this court.

## II

## STANDARD OF REVIEW

We face first a threshold question: what standard of review applies to the Trustees' determination regarding the date of disability and thus their decision partially to deny Anderson's application? The court will review de novo the district court's decision to apply an abuse of discretion standard to the Trustees' decision. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 962 (9th Cir. 2006) (en banc).

When a court reviews an ERISA plan administrator's decision to grant or deny benefits, de novo is "the default standard of review." *Id.* at 963. However, if the plan grants discretion to the plan administrator "to determine eligibility for benefits or to construe the terms of the plan," the court reviews the administrator's decision for an abuse of discretion. *Id.* (quotation omitted).

Even if a plan grants discretion to the administrator, the standard of review shifts to de novo if the administrator engages in "wholesale and flagrant violations of the procedural requirements of ERISA, and thus acts in utter disregard of the underlying purpose of the plan as well." *Id.* at 971.[1]

---

[1]In *Abatie*, the plan administrator added a new reason on appeal for its denial of the participant's benefits such that the participant never had the opportunity to respond to that reason for the denial. *Id.* at 961. Sitting en banc, we concluded that error was not so flagrant as to preclude abuse of discretion review. *Id.* at 972. As an example of "that rare class of cases" in which a procedural violation crosses the line so as to warrant de novo review, *id.*, the court cited *Blau v. Del Monte Corp.*, 748 F.2d 1348 (9th Cir. 1984), *abrogation on other grounds recognized by Dytrt v. Mtn.*

That is, de novo review is justified if the administrator's decision was so plagued with errors and "so far outside the strictures of ERISA" that we cannot say the administrator actually exercised discretion. *Id.* at 972. Most procedural errors do not alter the abuse of discretion standard, but the court should consider such errors when deciding whether the administrator abused its discretion. *Id.*

The parties agree that the Plan grants discretion to the Trustees. Therefore, unless the Trustees committed wholesale and flagrant procedural violations, the court will review their decision for an abuse of discretion.

**[1]** The Trustees did not comply with all of ERISA's procedural requirements.[2] ERISA provides that:

*States Tel. & Tel. Co.*, 921 F.2d 889 (9th Cir. 1990). In *Blau*, the ERISA administrator kept the plan details secret from employees, provided no claims procedure, and never gave employees in writing the details of the plan: the administrator " 'failed to comply with virtually every applicable mandate of ERISA.' " *Abatie*, 458 F.3d at 971 (quoting *Blau*, 748 F.2d at 1353).

[2]ERISA plans established pursuant to collective bargaining agreements are exempt from certain of ERISA's claims procedures, including those that Anderson alleges the Trustees violated in this case. *See* 29 C.F.R. § 2560.503-1(b)(6) (explaining that for certain plans established pursuant to collective bargaining, certain of ERISA's procedural regulations will not apply if the collective bargaining agreement "sets forth or incorporates by specific reference — (A) [p]rovisions concerning the filing of benefit claims and the initial disposition of benefit claims, and (B) [a] grievance and arbitration procedure to which adverse benefit determinations are subject.").

For two reasons, however, we assume the standard regulations apply. First, the Trustees have not contended that the Plan falls under this exception. *See Bard v. Boston Shipping Ass'n*, 471 F.3d 229, 239 n.11 (1st Cir. 2006). Second, the record lacks the collective bargaining agreement under which the Plan was established, so we cannot decide whether the agreement suffices to trigger the exemption.

In accordance with regulations of the Secretary, every employee benefit plan shall —

> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133. Pursuant to § 1133, the Secretary promulgated 29 C.F.R. § 2560.503-1(h)(3)(ii), which states that a plan must provide for a review of disability benefit determinations "conducted by an appropriate named fiduciary of the plan who is neither the individual who made the adverse benefit determination . . . nor the subordinate of such individual." As the express terms of the Plan provided for them to do, the Trustees decided both Anderson's initial application and his appeal of that decision.

**[2]** This procedural violation, however, was not so egregious as to fall into "that rare class of cases" in which de novo review should apply. *Abatie*, 458 F.3d at 972. Assuming without deciding that the term "individual" in 29 C.F.R. § 2560.503-1(h)(3)(ii) applies to a deliberative body,[3] we find that Anderson has not shown that in deciding both his initial

---

[3]*See Johnston Envt'l Corp. v. Knight* (*In re Goodman*), 991 F.2d 613, 619 (9th Cir. 1993) (" '[I]ndividual' means individual, and not a corporation or other artificial entity."). *But see United States v. Middleton*, 231 F.3d 1207, 1210 (9th Cir. 2000) ("Neither is 'individual' a legal term of art that applies only to natural persons.").

claim and his appeal, the Trustees committed "wholesale and flagrant violations of the procedural requirements of ERISA, and thus act[ed] in utter disregard of the underlying purpose of the plan as well." *Abatie*, 458 F.3d at 971. In their decision on both Anderson's initial claim and his appeal, the Trustees provided detailed reasons for their denial and did not appear substantively to defer to their initial decision. The minutes of the Trustees' meeting on Anderson's appeal reflect their detailed consideration of all the evidence before them. That the result of both meetings was the same does not itself show that the Trustees flagrantly disregarded ERISA's requirement that individuals receive full and fair review of claim denials, because Anderson did not submit additional evidence — only argument — between the two meetings of the Trustees on his claim. Finally, both the composition of the board and the attendance at the meetings changed such that three of the eight members of the Board of Trustees present at the meeting considering Anderson's appeal were not present at the meeting on his initial claim. Therefore, the Court will review for an abuse of discretion the Trustees' partial denial of Anderson's application for disability benefits, taking into account the Trustees' procedural errors.

## III

## CONFLICT OF INTEREST

[3] We must also decide whether the Trustees had a conflict of interest. If a plan administrator labors under a conflict of interest, the court must consider that conflict of interest as a factor in determining whether the administrator abused its discretion. *Metropolitan Life Ins. Co. v. Glenn*, ___ U.S. ___, 128 S. Ct. 2343, 2348 (2008).

[4] A conflict of interest exists "where it is the employer that both funds the plan and evaluates the claims." *Id.* This is because " 'every dollar provided in benefits is a dollar spent by . . . the employer; and every dollar saved . . . is a dollar

in [the employer's] pocket.' " *Id.* (quoting *Bruch v. Firestone Tire & Rubber Co.*, 828 F.2d 134, 144 (3d Cir. 1987), *aff'd in part*, *rev'd in part*, 489 U.S. 101 (1989)) (omissions and alteration in original). The Plan here does not meet that standard.

**[5]** The Plan is a multi-employer benefit trust fund maintained under the Taft-Hartley Act. The various participating employers — not the Trustees — fund the Plan. The Trustees have no personal economic interest in the decision to grant or deny benefits. Additionally, the Board of Trustees consists of both employer and employee representatives, who determine employee eligibility under the Plan. Both sides are at the table. *See Jones v. Laborers Health & Welfare Trust Fund*, 906 F.2d 480, 481 (9th Cir. 1990) ("Because the Board of Trustees consists of both management and union employees, there is no conflict of interest to justify less deferential review."). For these reasons, the Trustees did not have a conflict of interest.

## IV

## THE DATE OF ANDERSON'S DISABILITY

**[6]** We must now determine whether the Trustees abused their discretion when they determined the date of Anderson's disability. A plan administrator abuses its discretion if it renders a decision without any explanation, construes provisions of the plan in a way that conflicts with the plain language of the plan, or fails to develop facts necessary to its determination. *Schikore v. BankAmerica Supplemental Ret. Plan*, 269 F.3d 956, 960 (9th Cir. 2001).

The date of Anderson's disability is crucial to his benefits calculation. If Anderson became disabled after May 1, 1998, he would receive disability payments based on Benefit Credits he actually earned during his years of employment. However, if Anderson became disabled before May 1, 1998, he would

receive disability payments calculated as if he continued to work from the date of his disability all the way up until his normal retirement age. All of the future years Anderson would not be working would still count toward his accumulation of Benefit Credits. Based on this enhanced number of Benefit Credits, Anderson would receive a greater monthly payment than if he were disabled after May 1, 1998.

The Trustees did not abuse their discretion in determining the date of Anderson's disability. The standard for disability in both the 1995 Plan and the 1999 Plan requires that the disability prevent the employee "from pursuing *any and all gainful occupations* and from performing *any work for compensation or benefit*." 1995 and 1999 Plans, § 6.03 (emphasis added).

**[7]** Although he claims to have been disabled as of June 1, 1997, Anderson worked for fifty-one days from June to October in 2001. His employment was a "gainful occupation." In return for his work, he earned a paycheck and even received Benefit Credits under the Plan. Following the plain language of the Plan, the Trustees had a reasonable basis to conclude that Anderson was not "totally and permanently disabled" until the end of his employment in 2001.[4] The Trustees did not abuse their discretion in applying § 6.02(a) of the Plan and calculating Anderson's benefits based on the Benefit Credits he actually earned.

_____

[4]In his reply brief, Anderson argues that the Summary Plan Description contains a more lenient standard of disability than the Plan. *See Bergt v. Ret. Plan for Pilots Employed by MarkAir, Inc.*, 293 F.3d 1139, 1145 (9th Cir. 2002). However, Anderson forfeited this argument by failing to raise it in his opening brief. *See Dilley v. Gunn*, 64 F.3d 1365, 1367 (9th Cir. 1995). Additionally, Anderson's counsel did not argue this point at oral argument.

## V

## THE ANTI-CUTBACK RULE

Anderson argues alternatively that if he did not become disabled until November 2001 — which he did not — then the 1999 Plan amendment is invalid under 29 U.S.C. § 1054(g). Anderson raised this issue in the district court, but the court did not address it. *Anderson v. Suburban Teamsters of N. Ill. Pension Fund Bd. of Trustees*, No. CV-05-1377-DGC (D. Ariz.), *Memorandum in Support of Plaintiff's Complaint* (Docket No. 97) at 1-2; *Order* (Docket No. 106).

**[8]** Section 1054(g) is ERISA's so-called "anti-cutback" provision. It states that "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan," subject to certain exceptions not applicable here. 29 U.S.C. § 1054(g)(1) (2006). The purpose of the anti-cutback rule is to "prevent employers from pulling the rug out from under plan participants by eliminating or reducing certain forms of benefits through a plan amendment." *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1119 (9th Cir. 2000) (quotation omitted).

**[9]** However, § 1054(g) does not apply to "employee welfare benefit plans." 29 U.S.C. § 1051(1) (2006) (excluding such plans from Part 2 of ERISA). An "employee welfare benefit plan," or "welfare plan," is defined as

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, *to the extent* that such plan, fund, or program was established or is maintained for the purpose of providing . . . *benefits in the event of* sickness, accident, *disability*, death or unemployment . . . .

29 U.S.C. § 1002(1) (2006) (emphasis added).

A welfare plan is distinguished from an "employee pension benefit plan" in that the latter is

> established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program —
>
> (i) provides retirement income to employees, or
>
> (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond . . . .

29 U.S.C. § 1002(2)(A) (2006).

**[10]** The question here is whether disability benefits such as those provided by the Plan constitute an employee welfare benefit plan that ERISA permits employers to cut. The Second, Sixth, and Eleventh Circuits have all answered, "Yes."

The Second Circuit case of *Rombach v. Nestle, USA, Inc.*, 211 F.3d 190 (2d Cir. 2000), is quite similar to Anderson's. The plan in *Rombach* was a comprehensive plan that provided for several different pensions, including a normal retirement pension, an early retirement pension, and a "disability retirement pension." *Id.* at 191 n.1.

The plan had previously calculated the amount of the disability retirement pension as if the disabled employee's "period of service as an Employee had been extended from the commencement date of such pension up to his or her Normal Retirement Date." *Id.* at 192. Under this provision, the employee received credit not only for actual service, but also for service the employee would have performed had the employee not become disabled. The plan was amended to calculate the disability retirement pension in accordance with "the normal retirement benefit accrued by the [employee] as

of the date of retirement due to disability." *Id.* (alteration in original). This calculation allowed no credit for service not actually performed.

Rombach, an employee covered by the plan, became disabled and applied for benefits. In accordance with the amendment, the plan administrator calculated the amount of her disability pension with reference only to her actual service. Rombach argued that the amendment violated § 1054(g) by failing to follow the requirements necessary for an exception to the anti-cutback rule. *Id.* at 191-92.

The Second Circuit held that "the disability provisions of the Pension Plan are an 'employee welfare benefit plan' under 29 U.S.C. § 1002(1), to which the protections of § 1054(g) do not apply." *Id.* at 192. The court emphasized that the statutory definition of a welfare plan includes within its scope any plan "to the extent" the plan provides "benefits in the event of . . . disability":

> In our view, it does not matter that Nestle called the disability retirement pension portion of its plan a "pension benefit" and made it part of its master "pension plan." Its meaning and function remained clear; *it was a benefit triggered by disability*. And, under the plain language of the statute, "to the extent" that Nestle's Pension Plan provides benefits that are triggered by disability, *that portion of the plan is a welfare plan* under § 1002(1).

*Id.* at 194 (emphasis added). *See also Robinson v. Sheet Metal Workers' Nat'l Pension Fund*, 441 F. Supp. 2d 405, 417-18 (D. Conn. 2006), *aff'd in part*, *dismissed in part*, 515 F.3d 93 (2d Cir. 2008). The Eleventh Circuit relied on *Rombach* in holding that § 1054(g) did not apply to a no-interest award of retroactive disability benefits. *Green v. Holland*, 480 F.3d 1216, 1228 (11th Cir. 2007).

In a similar context, the Sixth Circuit has also held that the disability portion of a master plan was a welfare plan. *McBarron v. S & T Indus., Inc.*, 771 F.2d 94, 97 (6th Cir. 1985). The plan in *McBarron* provided for a disability benefit, but the disabled employee was not entitled to that benefit if the employee was also receiving payments from Workmen's Compensation. *Id.* at 96. The employee argued this provision violated 29 U.S.C. § 1053(a), ERISA's anti-forfeiture provision. Like the anti-cutback rule, the anti-forfeiture provision does not apply to welfare plans. 29 U.S.C. § 1051(1) (2006). The court, relying on the "to the extent" language of § 1002(1), held that the disability benefits constituted a welfare plan, and therefore ERISA's anti-forfeiture rule did not apply to them. *McBarron*, 771 F.2d at 97.

**[11]** We agree with our sister circuits. The statute specifies that a plan is a welfare plan "to the extent" that it provides "benefits in the event of . . . disability." 29 U.S.C. § 1002(1) (2006). The "to the extent" language evidences Congress's intent that the definition encompass *any portion* of a plan in which the employee's disability triggers the right to the benefit. *Rombach*, 211 F.3d at 194. The disability benefit here fits this mold. We hold that Anderson's disability retirement pension is not subject to the anti-cutback rule because it is an employee welfare benefit plan.

# VI

## THE QDRO

Finally, Anderson argues that the Trustees improperly applied the QDRO to reduce his disability benefit in favor of his ex-wife, the alternate payee. Anderson claims that until his ex-wife elects to begin receiving her portion of the benefit, he is entitled to the full amount, without any reduction pursuant to the QDRO. We review de novo a decision regarding obligations under a QDRO. *Owens v. Auto. Machinists Pension Trust*, 551 F.3d 1138, 1142 (9th Cir. 2009).

**[12]** A QDRO requires a plan administrator to provide part or all of an employee's pension to an ex-spouse. 29 U.S.C. § 1056(d)(3)(B) (2006). According to the Department of Labor, there are two basic types of QDROs: "separate interest" QDROs and "shared payment" QDROs. U.S. Dep't of Labor, *The Division of Pensions Through Qualified Domestic Relations Orders*, *http://www.dol.gov/ebsa/publications/ qdros.html*, Question 3-3. A separate interest QDRO divides the benefit into two different pensions, one for the plan participant and one for the alternate payee. Because there are two pensions, the alternate payee can receive her benefit "at a time and in a form different from that chosen by the participant." *Id.*

On the other hand, a shared payment QDRO assigns the alternate payee a portion of each monthly payment. "Under this approach, the alternate payee will not receive any payments unless the participant receives a payment or is already in pay status." *Id.*

The Trustees found the QDRO to be a separate interest QDRO creating two separate pensions. Once the pension was split, they reasoned, Anderson no longer had an interest in any of his ex-wife's pension.

**[13]** The Trustees were correct. The QDRO grants the alternate payee half of Anderson's pension as of February 25, 1999. It allows Anderson's ex-wife to begin receiving her payments at Anderson's earliest retirement age: thus, she could be paid even if Anderson were still working. This is impossible with a shared payment QDRO, where the ex-spouse receives a payment only when the plan participant does. For these reasons, Anderson's QDRO was a separate interest QDRO, and he cannot share in any of the benefits allocated to his ex-wife.

## VII

## CONCLUSION

The Trustees did not abuse their discretion in finding Anderson disabled as of November 2001 and correctly applied the QDRO to reduce the amount of Anderson's benefits in favor of his ex-wife. Further, Anderson's disability retirement pension is an employee welfare benefit plan, even though it is only part of a comprehensive ERISA plan and even though the Plan refers to it as a "pension." As a welfare plan, the disability retirement pension is not subject to the anti-cutback rule.

**AFFIRMED.**