09-3651-cv
Durakovic v. Bldg. Serv. 32 BJ Pension Fund

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2009

(Argued: April 5, 2010          Decided: June 24, 2010)

Docket No. 09-3651-cv

- - - - - - - - - - - - - - - - - - - - -x

BEJAZE DURAKOVIC,

          Plaintiff-Appellant,

          - v.-

BUILDING SERVICE 32 BJ PENSION FUND, BUILDING SERVICE 32BJ
HEALTH FUND, BUILDING SERVICE 32BJ BENEFITS FUND,

          Defendants-Appellees.

- - - - - - - - - - - - - - - - - - - - -x


     Before:          JACOBS, Chief Judge, WINTER and WALKER,
                      Circuit Judges.

     Plaintiff, Bejaze Durakovic, appeals from an August 4,

2009 judgment of the United States District Court for the

Eastern District of New York (Block, J.), dismissing her

ERISA challenge to a union disability-benefits denial.

Durakovic, an office cleaner, suffered chronic pain and

weakness in the years following a 1999 automobile accident,

and applied for disability benefits from the relevant union

funds. When her claim was denied, she filed suit in federal court pursuant to 29 U.S.C. § 1132(a)(1)(B). On cross motions for summary judgment, the district court dismissed the suit. **REVERSED.**

IRA H. ZUCKERMAN (Max D. Leifer, of counsel), New York, NY, for Plaintiff-Appellant.

Ira A. Sturm, Raab, Sturm & Ganchrow, LLP, New York, NY, for Defendants-Appellees.[*]

DENNIS JACOBS, Chief Judge:

Plaintiff, Bejaze Durakovic, appeals from an August 4, 2009 judgment of the United States District Court for the Eastern District of New York (Block, J.), dismissing her ERISA challenge to a union disability-benefits denial. Durakovic, an office cleaner, suffered chronic pain and weakness in the years following a 1999 automobile accident, and applied for disability benefits from the relevant union funds. When her claim was denied, she filed suit in federal court pursuant to 29 U.S.C. § 1132(a)(1)(B).[1] On cross

---

[*] Appellees' counsel failed to appear for oral argument.

[1] 29 U.S.C. § 1132(a)(1)(B) affords a right of action to a "participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights

motions for summary judgment, the district court dismissed the suit.  We reverse, holding that a fund organized pursuant to 29 U.S.C. § 186(c)(5) is conflicted within the meaning of Metropolitan Life Insurance Company v. Glenn, 128 S. Ct. 2343 (2008); that the district court should have accorded the conflict in this case more weight; and that no rational trier of fact could have failed to conclude that the benefits denial was arbitrary and capricious.

## BACKGROUND

Bejaze Durakovic emigrated to this country from Yugoslavia in 1971, when she was twenty-four; she never attained more than a sixth-grade education.  For thirty-two years, she was an office cleaner at 55 Water Street, in New York City, and a member of the Service Employees International Union, Local 32B-J.  In 1999, Durakovic was involved in an automobile accident, but continued to work, reporting chronic pain and weakness.  This continued until 2003, when the pain and weakness caused her to cease work.

Durakovic filed a claim for disability benefits with her union pension, health, and benefits funds (the "Funds")

to future benefits under the terms of the plan."

3

in December 2003. The union disability plan provides benefits to those deemed "totally and permanently unable, as a result of bodily injury or disease, to engage in any further employment or gainful pursuit." In support of her claim, she submitted reports by two physicians, Dr. Leonard Langman, a neurologist, and Dr. Alan Dayan; and a notice of benefits award from the Social Security Administration, which had found her disabled. On receipt of her benefits application, the Funds sent her to an independent physician, Dr. Ludmilla Bronfin, who also submitted a report.

- **Report of Dr. Langman**. Dr. Langman concluded that Durakovic was "totally disabled" "for any occupation." He diagnosed her with cervical and lumbar radiculopathy. And he noted that she complained of pain in her neck and lower back, and that she was experiencing spasms in the cervical and lumbar regions of her spine. His diagnosis was supported by a nerve conduction report, and MRIs of her back and right knee. The nerve conduction report also evidenced mild carpal tunnel syndrome, and the MRI indicated some tearing in the menisci of her right knee.

- **Report of Dr. Dayan**. Dr. Dayan conducted an initial consultation and concluded that Durakovic suffered from "[r]ight knee internal derangement that has been long lasting in nature and continues to cause significant disability."

- **Report of Dr. Bronfin**. Dr. Bronfin concluded that Durakovic "should not be deemed totally disabled and could attempt to work in a sedentary capacity." She based her conclusion on a physical examination and on Durakovic's medical records.

4

She accepted the diagnoses of Durakovic's doctors.

The Funds denied Durakovic's claim by letter dated March 5, 2004. They determined that Durakovic was not disabled "based on the following medical information: Dr. Ludmilla Bronfin, [the Funds'] panel neurologist, found that [she was] not totally and completely unable to work in any capacity for any occupation." The letter did not mention any of the evidence submitted by Durakovic.

Durakovic timely appealed the denial. The appeals board sent her to another independent physician, Dr. Ira Rashbaum, who submitted a report that echoed the relevant findings of Dr. Bronfin: Durakovic was "not totally disabled and could attempt to work in a sedentary capacity." Dr. Rashbaum premised his conclusion on, inter alia, a range-of-motion test of her spine and extremities, and a review of her medical records.

The appeals board denied Durakovic's appeal by letter dated December 13, 2004, based additionally on Dr. Rashbaum's report. Shortly thereafter, Durakovic commenced this action pursuant to 29 U.S.C. § 1132(a)(1)(B), challenging the Funds' decision to deny her disability benefits.

On March 20, 2007, the Funds reopened Durakovic's application in light of our decision in <u>Demirovic v. Building Service 32 B-J Pension Fund</u>, 467 F.3d 208 (2d Cir. 2006), which arose from a denial of benefits under the same disability plan. In <u>Demirovic</u>, we held that the Funds cannot deem a person able to work (and therefore not "totally disabled") simply because she is physically capable of performing some job, of whatever type; to be deemed able to work, a person must be able to work in some capacity for which she is vocationally qualified. <u>Id.</u> at 212-16. In the wake of <u>Demirovic</u>, the Funds initiated a vocational review. The administrator forwarded Durakovic's employment files and the reports of the two independent physicians to Apex Rehab Management for review and report. Durakovic also submitted a report from her own vocational rehabilitation consultant, Lynn Jonas.

- **Report of Apex Rehab Management.** Apex reviewed the reports of Drs. Bronfin and Rashbaum, and Durakovic's general work history. The report noted that Durakovic has "poor English language skills," and that she had worked only at unskilled jobs; but that doctors had concluded she could perform a "full range of sedentary work."

- **Report of Lynn Jonas.** In a report dated September 18, 2007, Lynn Jonas concluded that Durakovic was "unable to perform any work" and that "[e]ven if she was to 'attempt to work in a sedentary

capacity' she would not be able to work at a competitive pace to keep any job." Jonas subjected Durakovic to tests of manual dexterity and mental acuity, intended to evaluate her ability to perform unskilled sedentary jobs. Durakovic performed at or below the 11th percentile on all tests, and below the 5th on most.

- **Supplemental Report of Apex Rehab Management.** On October 15, 2007, Apex issued a "supplemental" employability report, having been provided since its initial report with some information from Dr. Bronfin that had been omitted from the files given Apex at the outset. The supplemental report added only a note that Durakovic suffered from mild carpal tunnel syndrome, but that there was "no indication of limitations in reaching, handling and fingering." The conclusion did not change.

Apex concluded that Durakovic was vocationally qualified for three occupations: "Jewelry Assembler" and "Food Checker," both semi-skilled; and one unskilled, the job of "Buttons Assembler."

The Funds again denied Durakovic's appeal, by letter dated December 10, 2007, premising their decision explicitly on Dr. Rashbaum's conclusion that Durakovic could work "in a sedentary capacity" and on Apex's conclusion that she was capable of performing "several occupations," including the assembly of buttons:

The Appeals Committee has determined that your condition does not meet the . . . eligibility standard based on the following medical and vocational information: Dr. Ira Rashbaum's

7

Independent Medical Evaluation of September 20, 2004 wherein he states that you are able to work in a sedentary capacity; [Apex's] Employability Evaluation Report of October 15, 2007[, which] states you have transferable skills and residual functional capabilities necessary to perform several occupations.  In addition, the Committee reviewed the medical records you submitted, as well as the entire file.

Durakovic thereafter amended her complaint in this action.

On July 31, 2009, the district court granted summary judgment in favor of defendants and denied Durakovic's cross-motion for summary judgment.  Durakovic v. Bldg. Serv. 32B-J Pension Fund, 642 F. Supp. 2d 146 (E.D.N.Y. 2009). This appeal timely followed.

**I**

We review decisions granting or denying summary judgment de novo, e.g., Woodman v. WWOR-TV, Inc., 411 F.3d 69, 75 (2d Cir. 2005), viewing the evidence in the light most favorable to the non-moving party, Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986), and asking whether the evidence "show[s] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c).  There is no genuine issue of material fact "'[w]here the record taken as

8

a whole could not lead a rational trier of fact to find for the non-moving party.'" Hayes v. New York City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996) (quoting Matsushita Elec. Ind. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986)).

The Funds' decision was subject to arbitrary-and-capricious review by the district court.[2] See, e.g., Celardo v. GNY Auto. Dealers Health & Welfare Trust, 318 F.3d 142, 145 (2d Cir. 2003) (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)). In Metropolitan Life Insurance Company v. Glenn, 128 S. Ct. 2343 (2008), the Supreme Court held that an ERISA-fund administrator that "both evaluates claims for benefits and pays benefits claims" is conflicted, and that a district court, when reviewing the conflicted administrator's decisions, should weigh the conflict as a factor in its analysis. Id. at 2348-50. The factor's weight depends on the circumstances. Id. at 2351.

Applying Glenn below, the district court concluded that

---

[2] In an action under 29 U.S.C. § 1132(a)(1)(B), the district court conducts arbitrary-and-capricious review of ERISA-fund administrators' discretionary decisions. E.g. Celardo, 318 F.3d at 145 (citing Bruch, 489 U.S. at 115). Neither party here disputes that the challenged decision was discretionary, and that arbitrary-and-capricious review was therefore proper.

"the Funds' conflict of interest [was] a factor, albeit a relatively unimportant one." Durakovic, 642 F. Supp. 2d at 152. Both parties challenge that conclusion on appeal. The Funds argue that they are not conflicted within the meaning of Glenn because the Funds are trusts administered by bodies composed equally of employee and employer representatives as required by the Taft-Hartley Act, 29 U.S.C. § 186(c)(5).[3] Durakovic argues that the conflict should have been weighted more heavily. The arguments are addressed in turn.

**A**

It is an open question in our Circuit whether funds organized pursuant to 29 U.S.C. § 186(c)(5) are conflicted within the meaning of Glenn. E.g. Petri v. Sheet Metal Workers' Nat'l Pension Fund, No. 07 Civ. 6142(JGK), 2009 WL 3075868, at *6 (S.D.N.Y. Sept. 28, 2009). We hold that they are.

---

[3] 29 U.S.C. § 186(c)(5)(B) requires, in relevant part, that union-established trust funds funded by employer contributions and operated "for the sole and exclusive benefit of the employees of such employer" (or employers) be administered such that "employees and employers are equally represented . . . , together with such neutral persons as the representatives of the employers and the representatives of employees may agree upon."

A Glenn analysis proceeds in two steps. The initial inquiry is simple: whether the "plan administrator both evaluates claims for benefits and pays benefits claims." 128 S. Ct. at 2348; see also id. (Evaluator-payor dual role creates a conflict between the administrator's responsibilities to plan beneficiaries and its financial interests). If so, the court goes on to determine how heavily to weight the conflict of interest thus identified, considering such circumstances as whether procedural safeguards are in place that abate the risk, "perhaps to the vanishing point." Id. at 2351.

Employer-administrators have a categorical conflict. Glenn recognized that the dual-role conflict may arise with other administrators as well, such as insurer-administrators like MetLife (the defendant in that case), though affecting them perhaps differently and less. Id. at 2349-50 (An insurance company may have "a much greater incentive than a self-insuring employer to provide accurate claims processing" because, inter alia, insurance-market competition will punish the insurer for product inferiority, to which biased claims processing contributes.). But such distinctions do not affect "the existence of a conflict";

11

they affect the "significance or severity" of a conflict:

> [A] legal rule that treats insurance company administrators and employers alike in respect to the existence of a conflict can nonetheless take account of the circumstances to which MetLife points so far as it treats those, or similar, circumstances as diminishing the significance or severity of the conflict in individual cases.

128 S. Ct. at 2350. Procedural safeguards are properly considered only at the second step. Id. at 2350-51.

An administrator organized pursuant to 29 U.S.C. § 186(c)(5) should be treated no differently. Here, as in Glenn, the evaluation of claims is entrusted (at least in part) to representatives of the entities that ultimately pay the claims allowed. Cf. 128 S. Ct. at 2348. This is precisely the type of interest conflict to which Glenn applies: The employer representatives have fiduciary interests that weigh in favor of the trusts' beneficiaries on the one hand, but representational and other interests that weigh to the contrary. Cf. id. That the board is (by requirement of statute) evenly balanced between union and employer does not negate the conflict. The existence of union representation should be considered, as the district court concluded, at Glenn's second step. And that the administrator is here a trust, rather than the employer

12

itself or a third-party for-profit institution, does not control. The rejection of claims will reduce future employer contributions. See Holland v. Int'l Paper Co. Ret. Plan, 576 F.3d 240, 249 (5th Cir. 2009) (Rejection of claims will limit future increases in employer contributions.); Burke v. Pitney Bowes Inc. Long-Term Disability Plan, 544 F.3d 1016, 1026-27 (9th Cir. 2008); but see White v. Coca-Cola Co., 542 F.3d 848, 858 (11th Cir. 2008). All but one of the purportedly contrary persuasive opinions cited by the Funds are non-precedential, outdated (pre-Glenn), or both.[4] Only the Ninth Circuit has held in a precedential post-Glenn opinion that funds organized pursuant to 29 U.S.C. § 186(c)(5) are not conflicted within the meaning of Glenn. Anderson v. Suburban Teamsters of N. Ill. Pension Fund Bd. of Trs., 588 F.3d 641, 648 (9th Cir. 2009).[5] There may be

_____

[4] See Klein v. Cent. States, Se. & Sw. Areas Health & Welfare Plan, 346 F. App'x 1 (6th Cir. 2009) (non-precedential); Johnson v. Bert Bell/Pete Rozelle NFL Player Retirement Plan, 468 F.3d 1082, 1086 (8th Cir. 2006) (outdated); Otto v. W. Pa. Teamsters & Employers Pension Fund, 127 F. App'x 17, 20 (3rd Cir. 2005) (outdated and non-precedential); Manny v. Cent. States, Se. & Sw. Areas Health & Welfare Plan, 388 F.3d 241, 242-43 (7th Cir. 2004) (outdated).

[5] The Ninth Circuit's decision in Anderson rests on a shaky foundation. That case held that a § 186 fund is not conflicted for two reasons: [1] because it is, by definition, a multi-employer trust in which the trustees do

13

cases in which the existence of a <u>Glenn</u> conflict is difficult to ascertain; but this is not one of them.

**B**

The weight properly accorded a <u>Glenn</u> conflict varies in direct proportion to the "likelihood that [the conflict] affected the benefits decision":

> The conflict . . . should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

<u>Glenn</u>, 128 S. Ct. at 2351 (citation omitted). Evidence that

---

not have a personal interest, and [2] because evaluations must be made by a balanced board. 588 F.3d at 648. But the first reason was contrary to the Ninth Circuit's earlier post-<u>Glenn</u> decision in <u>Burke v. Pitney Bowes Inc. Long-Term Disability Plan</u>, 544 F.3d 1016, 1026 (9th Cir. 2008), which held that "even when a plan's benefits are paid out of a trust, a structural conflict of interest exists that must be considered as a factor in determining whether there was an abuse of discretion." And the <u>Anderson</u> court's support for its second reason was a citation to <u>Jones v. Laborers Health & Welfare Trust Fund</u>, 906 F.2d 480 (9th Cir. 1990), a pre-<u>Glenn</u> decision.

14

a conflict affected a decision may be categorical (such as "a history of biased claims administration") or case specific (such as an administrator's deceptive or unreasonable conduct), and may have bearing also on whether a particular decision is arbitrary and capricious. See id. at 2351-53; McCauley v. First Unum Life Ins. Co., 551 F.3d 126, 138 (2d Cir. 2008). In Glenn, for example, the Court suggested that the conflict could have been given more weight because MetLife took "seemingly inconsistent positions [that] were both financially advantageous": "MetLife had encouraged Glenn to argue to the Social Security Administration that she could do no work, received the bulk of the benefits of her success in doing so . . . , and then ignored the agency's finding in concluding that Glenn could in fact do sedentary work." Id. at 2352. The Court suggested moreover that this evidence was relevant also to the reasonableness of MetLife's decision. Id. And in McCauley v. First Unum Life Ins. Co., 551 F.3d 126 (2d Cir. 2008), we more heavily weighted a conflict because the administrator unreasonably relied on a single medical report, which aligned with its financial interests, "to the detriment of a more detailed contrary report without further

15

investigation"; behaved deceptively toward the benefits applicant; and had a history of biased claims evaluation. See id. at 134-38. No weight is given to a conflict in the absence of any evidence that the conflict actually affected the administrator's decision. Hobson v. Metropolitan Life Ins. Co., 574 F.3d 75, 83 (2d Cir. 2009).

The district court here concluded that the conflict was "relatively unimportant." Durakovic, 642 F. Supp. 2d at 152. As the court observed, "[t]here is no evidence that the Funds have a history of biased plan administration." Id.; cf. Glenn, 128 S. Ct. at 2351. And the court properly noted that "[t]he Funds' procedures . . . provide many safeguards against bias":

> [1] The Funds hire independent medical and vocational examiners; [2] the Appeals Committee is composed of different individuals than those who decided the initial denial and is required to send the claimant to a new medical examiner; and [3] the Appeals Committee consists of equal numbers of representatives of the union and the employers, none of whom are paid by the Funds.

Durakovic, 642 F. Supp. 2d at 152; cf. Glenn, 128 S. Ct. at 2351. But the court did not seem to consider the Funds' decisionmaking deficiencies.

The Funds' consideration of Durakovic's claim (at least after the claim was reopened post-Demirovic) was one-sided.

16

The Funds summarily dismissed the report by Durakovic's vocational expert, which was vastly more detailed and particularized than the report on which the Funds relied, that of their own vocational expert. Cf. McCauley, 551 F.3d at 138 ("Reliance on one medical report to the detriment of a more detailed contrary report without further investigation was unreasonable" and "lead[s] to the conclusion that [the administrator] was in fact affected by its conflict of interest."). True, the Funds requested a supplemental report from Apex Rehab Management (the Fund's vocational expert), for the purpose of incorporating information from Dr. Bronfin (one of the Funds' medical experts) that the Funds had apparently omitted from the file given to Apex at the outset. But the Funds never did so for the purpose of incorporating Durakovic's vocational report and vocational testing results. Cf. Glenn, 128 S. Ct. at 2352 ("Seemingly inconsistent" actions are evidence that a conflict affected an administrator's decision where the actions are "both financially advantageous."). These facts bespeak the influence of a conflict of interest, cf. id.; McCauley, 551 F.3d at 134-38; in light of them, the district court should have accorded the conflict more weight.

17

**II**

Was the Funds' decision arbitrary and capricious? In conducting that review, "[a] court may overturn a plan administrator's decision to deny benefits only if the decision was without reason, unsupported by substantial evidence or erroneous as a matter of law." Celardo, 318 F.3d at 146 (internal quotation marks omitted). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the administrator and requires more than a scintilla but less than a preponderance." Id. (brackets, ellipsis, and internal quotation marks omitted).

Durakovic's disability plan provides that she is eligible for disability benefits if she is "totally and permanently unable . . . to engage in any further employment or gainful pursuit." We held in Demirovic that this language requires the administrator to undertake two analyses when determining disability-benefits eligibility: [1] a physical capacity analysis--whether the applicant is physically capable of further employment--and [2] a vocational capacity analysis--whether the applicant is vocationally qualified for any further employment of which

18

she is physically capable. 467 F.3d at 215. Durakovic disputes on both grounds, and we address them in turn.

**A**

The Funds' physical-capacity determination was not arbitrary or capricious. Though Durakovic submitted multiple medical reports supporting her disability, the Funds' determination was supported by the reports of two independent doctors: Drs. Bronfin and Rashbaum. Cf. Demirovic, 467 F.3d at 212 (holding that a denial was not arbitrary and capricious where supported by the reports of two independent physicians, even in light of contrary findings by five treating physicians and the Social Security Administration). The Funds were not required to accord special deference to the conclusions of Durakovic's physicians. See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003) ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."). Nor were the Funds required to

19

accord special deference to the determination of the Social Security Administration. See Paese v. Hartford Life & Acc. Ins. Co., 449 F.3d 435, 442-43 (2d Cir. 2006).

**B**

The next question is whether the applicant "has the vocational capacity to perform any type of work--of a type that actually exists in the national economy--that permits her to earn a reasonably substantial income from her employment, rising to the dignity of an income or livelihood." Demirovic, 467 F.3d at 215. In short, she must be able to do it and earn money at it. On the evidence in the record, no trier of fact could fail to find the Funds' vocational-capacity determination to have been arbitrary and capricious.

The Funds relied exclusively on the report prepared by Apex Rehab Management, their vocational expert; but that report was seriously and obviously flawed.

Apex concluded that Durakovic was vocationally qualified for three occupations. Two of those are semi-skilled: jewelry assembler and food checker. The report acknowledges, however, that Durakovic's only experience was

at unskilled labor.  She has no appreciable skills; she had an elementary education, largely if not exclusively in another country; she has little English; and her only employment for thirty-five years was as an office cleaner. It is arbitrary and capricious to expect her to develop skills for the first time at age 60, or to assume that an employer would invest money in skills training for an unskilled worker of that age.  See Demirovic, 467 F.3d at 213 (noting that plaintiff "is in her late fifties"); 20 C.F.R. Pt. 404, Subpt. P, App. 2 (considering age as a factor in determining disability for Social security purposes).

The one line of *unskilled* employment that Apex identified is "buttons assembler."[6]  For Durakovic, this is at best an uncertain career.  Even assuming Durakovic could join the ranks of buttons assemblers, there is no finding (in the Apex report or by the Funds) that such a line of employment would "permit[] her to earn a reasonably

---

[6] Since virtually all buttons that operate as garment clasps are one-piece, it may be that buttons needing assembly are of the kind that contain a slogan or promote a political candidacy ("I Like Ike"; "Better Red than Dead"). The record does not show how many people make a living at this.

21

substantial income from her employment, rising to the dignity of an income or livelihood." Demirovic, 167 F.3d at 215.

Moreover, the Funds almost entirely ignored the report prepared by Durakovic's expert, Lynn Jonas, which was both detailed and particularized where the Apex report was not. Jonas subjected Durakovic to finely-tuned tests of dexterity and mental acuity designed to evaluate her ability to perform various unskilled occupations. Durokovic scored at or below the eleventh percentile on all, and below the fifth percentile on most. Jonas concluded that Durokovic could not actually perform any of the sedentary occupations for which she was vocationally qualified.

Giving appropriate weight to the Glenn conflict, any rational trier of fact would conclude that the Funds' decision was unsupported by substantial evidence, and therefore arbitrary and capricious. The district court should have granted summary judgment in favor of Durakovic.

**CONCLUSION**

For the foregoing reasons, the district court's judgment is reversed, and the case is remanded for entry of judgment in favor of Durakovic.