**BIOMED PHARMACEUTICALS, INC., Plaintiff,**

v.

**OXFORD HEALTH PLANS (N.Y.), INC., Defendant.**

**No. 10 Civ. 7427(JSR).**

United States District Court, S.D. New York.

Nov. 15, 2011.

Michael Joseph Dillon, McDermott, Will & Emery, LLP, New York, NY, Steven Elliot Siff, McDermott, Will & Emery, LLP, Miami, FL, for Plaintiff.

Michael H. Bernstein, Elizabeth Richer Chesler, John T. Seybert, Sedgwick, Detert, Moran & Arnold, LLP, New York, NY, for Defendants.

*MEMORANDUM*

JED S. RAKOFF, District Judge.

On September 28, 2010, defendant Oxford Health Plans (N.Y.), Inc. ("Oxford") removed the above-captioned action from New York State court. On October 12, 2010, plaintiff Biomed Pharmaceuticals, Inc. ("Biomed") filed an Amended Complaint, which Oxford moved to dismiss on October 28, 2010. On February 17, 2011, the Court issued a Memorandum Order concluding that Biomed had both constitutional and statutory standing to pursue its claims and granting Biomed leave to amend its complaint one final time. On March 1, 2011, Biomed filed a Second Amended Complaint asserting five causes of action: one count alleging violations of 29 U.S.C. § 1132(a)(1)(B) (ERISA § 502(a)(1)(B)); three counts alleging violations of 29 U.S.C. § 1132(a)(3) (ERISA § 502(a)(3)); and one count alleging defamation in violation of New York state law. On April 21, 2011, Oxford moved to dismiss all counts with exception of Count One, Biomed's claim under 29 U.S.C. § 1132(a)(1)(B). Following full briefing and oral argument, the Court granted Oxford's motion with prejudice. *See* 04/19/11 Order; 07/01/11 Memorandum. The parties thereafter completed discovery with respect to Biomed's remaining claim, and Oxford moved for summary judgment on June 3, 2011. Biomed filed papers in opposition to the motion on June 24, 2011; Oxford filed reply papers as well as a motion to strike on July 1, 2011; and the Court heard oral argument on July 6, 2011. After careful consideration, the Court, by Order dated October 31, 2011, denied Oxford's motion for summary judgment. This Memorandum states the reasons for that ruling.

The relevant facts, either undisputed or, where disputed, taken most favorably to the plaintiff, are as follows. Oxford is an insurer that offers employee welfare health plans. 2d Am. Compl. ¶ 6. Oxford's Point–of–Service ("POS") plans allow members, for a higher premium, the choice of going either in-network or out of-network for care. *Id.* ¶ 7. Oxford has contracted with Solutions in Stainless, Inc. ("Solutions") to provide a "Freedom Plan Select" benefit plan (the "Plan") to Solutions employees incorporating Oxford's POS option. *Id.* ¶ 8; Plaintiff's Response to Defendant's Statement of Material Facts Pursuant to Local Rule 56.1 Statement ("Biomed 56.1 Response") ¶¶ 1, 13. The Plan is subject to the requirements of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.A. §§ 1001 *et seq.* ("ERISA"). 2d Am. Compl. ¶ 8. Because Oxford has discretionary authority to make all benefit determinations and to pay benefits under the Plan, it is the plan administrator. *Id.* ¶ 9.

The instant dispute concerns a minor patient (the "Patient"), whose father is a Plan participant and who is himself a covered dependent (or beneficiary) under the Plan. *Id.* ¶ 10. The Plan provides for an annual deductible of $1,000 and 30% coinsurance toward the cost of services provided by out-of-network providers, but such "out-of-pocket" costs are capped at "$2,500 for an individual and 2.5 times per family," after which Oxford pays everything. (13–14, 45, 167–68, 201).[1]

The Patient suffers from hemophilia, a chronic bleeding disorder that requires the regular administration of large doses of clotting medication called "Factor." *See* Declaration of Jennifer Hoefner, dated

---

1. The numbers in parentheses refer to the Bates Stamped pages starting with the prefix "BIOMED 000___," which are annexed as "Exhibit A" to the Declaration of Jacqueline Rivera, and as "Exhibit D" to the Declaration of Michael H. Bernstein.

June 24, 2011 ("Hoefner Decl.") ¶ 4; (334). Prior to October 2007, the Patient received his medication and services from Access Therapeutics, Inc. ("Access"), an out-of-network provider. Hoefner Decl. ¶ 4; 2d Am. Compl. ¶¶ 24–26. On October 5, 2007, Access was acquired by Biomed, an out-of-network provider of intravenous and injectable medications for patients with chronic medical conditions. *Id.* Biomed continued to provide treatment for the Patient, and the Patient, in turn, assigned all of his rights under the Plan to Biomed, including the right to sue to recover charges for services rendered by Biomed. *See* 2d Am. Compl. Ex. C. ¶ 5.[2] The Patient also authorized direct payment from Oxford to Biomed for services rendered. *Id.* Oxford accepted this assignment. *See* Hoefner Decl. ¶ 6.[3]

After Biomed acquired Access, it learned that Access had granted a financial hardship waiver to the Patient pursuant to which Access had waived the Patient's deductible and coinsurance. Declaration of Daniel Katzman, dated June 22, 2011 ("Katzman Decl.") ¶ 9; (3632–33, 3921).

Access, operating under its own assignment agreement with the Patient, had submitted claims to Oxford on the Patient's behalf, which claims were fully paid by Oxford in accordance with its usual and customary ("UCR") rates. Hoefner Decl. ¶ 8; 543, 868–1091. Following its acquisition of Access, Biomed continued to honor the Patient's prior financial hardship waiver. Hoefner Decl. ¶ 8; Declaration of Michael J. Dillon, dated June 24, 2011 ("Dillon Decl.") Ex. B. Thereafter, in early 2008, the Patient's father again requested a financial hardship waiver on behalf of the Patient, this time from Biomed. Hoefner Decl. ¶ 9; (3631). After considering the family's application and concluding that the Patient's financial circumstances warranted a waiver, Biomed granted the Patient a hardship waiver for 2008. Hoefner Decl. ¶ 10; Dillon Decl. Ex. B; (334–35).

On January 18, 2008, Cynthia Nunes, an Oxford employee, contacted the Patient's mother. (3387). Nunes encouraged the Patient's mother to utilize an in-network provider instead of Biomed, on the ground that Biomed's services were more costly to

---

**2.** The assignment provision states, in relevant part:

PAYMENT AUTHORIZED AND ASSIGNMENT OF BENEFITS: I hereby authorize Oxford to make payment to Biomed Pharm Inc. for authorized services provided, in consideration of Biomed Pharm Inc. [sic] agreement to forgo collection of my account for a reasonable period of time. I hereby assign to Biomed Pharm Inc. or its legal representative, all of my rights, including the right to sue on my behalf or name, under policy number [] issued by Oxford, to recover damages for services rendered by Biomed Pharm Inc. This assignment shall not extinguish or diminish my obligation to pay the full fee to Biomed Pharm Inc. for services rendered.

*See* 2d Am. Compl. Ex. C. ¶ 5. *See also* Declaration of Michael H. Bernstein, dated June 3, 2011 ("Bernstein Decl.") Ex. D–7.

**3.** *See* Plaintiff Biomed Pharmaceuticals, Inc.'s Memorandum of Law in Opposition to Defen-

dant's Motion for Summary Judgment ("Biomed Opp'n") at 3 n. 3:

As part of its "intake" procedures for new patients, Biomed contacts the insurer to determine the specifics and/or requirements of the patient's respective health benefit plan. At such time, Biomed confirms that the insurer will accept an assignment; and, where the patient has assigned his/her rights to Biomed, Biomed notifies the insurer that it will interact with the insurer on behalf of the patient pursuant to the assignment. This includes, but is not limited to, Biomed direct-billing the insurer. Biomed followed this procedure with respect to the Patient, and Oxford both accepted the assignment, and, since October 2007, has paid Biomed directly for claims submitted by Biomed on the Patient's behalf without objection.

*See also* Hoefner Decl. ¶ 6.

the Patient. *Id.*[4] The Patient's mother responded that it was not more costly to use Biomed, that Biomed was not charging the Patient for his deductible and coinsurance, and that her family did not wish to leave Biomed. *Id.* Nunes, who had been told when she joined Oxford in 1998 that all out-of-network waivers were "illegal," reported the conversation to Oxford's Special Investigations Unit ("SIU"). Dillon Decl. Ex. C at 63:23–65:24, 102:4–24; (3391).

Upon receipt of Nunes's report (*see* 3387), Jacqueline Rivera, a junior investigator at the SIU, concluded that the hardship waiver granted by Biomed was fraudulent. Dillon Decl. Ex. A at 26:9–29:23, 35:11–36:1, 49:3–50:22, 110:3–16, 130:8–22, 138:16–140:18, 147:24–149:13, 154:9–24, 228:16–232:11. At the time, Rivera believed that the Plan expressly prohibited hardship waivers by out-of-network providers and that it "unambiguously war[ned the Patient] of the consequences of lost benefits." *Id.* at 181:4–82:10, 185:13–186:12, 190:5–9; (339). According to Biomed, Rivera's investigation was part of a "medical cost savings" initiative undertaken by Oxford to reduce the amount spent on out-of-network treatments for certain medications, including the "Factor" prescribed to the Patient. Dillon Decl., Ex. A at 58:22–60:8.[5]

Following Rivera's determination, Oxford began "adjusting" the Patient's claims. Dillon Decl. Ex. A at 134:8–137:24. Claims submitted by Biomed on behalf of the Patient during 2008–2010 were first "adjudicated" by Oxford's Claims Department and adjusted pursuant to the UCR fee schedule. *Id.* at 213:9–25. Rivera then further reduced the claims by 30%, without regard to the Patient's out-of-pocket maximum or the fact that the out-of-pocket maximum amount (*i.e.*, $2,500) had also been deducted from Oxford's reimbursements to Biomed. *Id.* at 213:9–214:3; 1087–91, 1750, 1782, 1799–1800, 2718). In other words, Oxford took the position that the Patient never reached his annual maximum out-of-pocket coinsurance amount of $2,500, an interpretation that allowed Oxford to avoid ever paying 100%

---

4. *See also* Biomed's 56.1 Response ¶ 25 ("Ms. Nunes ... advised that using an in-network provider would be less expensive than going to an Out-of-Network provider, such as Biomed, because of the deductible and coinsurance obligations under the Plan.").

5. In its memorandum of law, Biomed elaborates as follows: Rivera tracked the savings to Oxford as a result of the reductions to the Patient's benefits per this initiative, reporting the same to her superior during the course of her investigation. (Dillon Decl., Ex. G.) Notably, this "waiver initiative" followed a documented 56% decrease between 2003 to 2007 in enrollment in Oxford's HMO plans, which correlated to an average decline in direct premiums earned by Oxford of $226,409,659. (Dillon Decl., Ex. H 8.) The New York State Department of Insurance attributed the decline to the increase in plans providing OON benefits, like the Plan at issue here, which provide greater flexibility and choice with respect to providers.

Oxford has made other improper attempts to control costs by reducing payments to OON providers. In February 2008, the New York State Attorney General investigated Oxford (and other insurers) regarding the improper manipulation of UCR rates paid to OON providers. (Dillon Decl., Ex. I.) The investigation focused on the insurer's inappropriate denials of portions of OON providers' claims, thereby imposing the costs on patients. (*Id.*) The company settled the probe on January 13, 2009. (Dillon Decl., Ex. J; Ex. K.) Soon thereafter, Oxford's parent also settled three class action lawsuits which were also predicated on the insurer's failure to pay OON benefits. (Dillon Decl., Ex. L.) Thus, Oxford's "initiative" against OON waivers, resulting in the subject 30% reduction on its payments to Biomed, is just the latest in a line of Oxford cost-savings initiatives aimed at OON providers. Biomed Opp'n at 9.

of the Patient's claims.2d Am. Compl. ¶ 48. Oxford failed to timely notify the Patient that it would treat Biomed's waiver as the Patient's "failure to pay" his share of responsibility under the Plan. Dillon Decl. Ex. A at 79:18–80:25, 138:5–141:12, 148:11–149:13; Ex. C 74:19–75:3; Katzman Decl. ¶¶ 16–21.

In March of 2008, Oxford conducted a broad audit of Biomed's claims for benefits. Biomed's 56.1 Response ¶ 28; (362–63, 512). Oxford reviewed prescriptions and financial records for seventeen specified members, including the Patient, for services provided by Biomed from January 1, 2002 through March 2008. Biomed's 56.1 Response ¶ 29; (362–63). Oxford also requested from Biomed the financial records of members who had claimed financial hardship. Biomed's 56.1 Response ¶ 30; (362–63). Upon review of the patient records produced by Biomed, Rivera concluded that approximately five to eight other waivers granted by Biomed to patients were also improper. Dillon Decl. Ex. A at 91:2–92:4. However, Oxford never "adjusted" the benefits of those five to eight other patients. *Id.*

In April 2008, Biomed discovered that the Patient's claims were being reduced and began contacting Oxford to reconcile what it understood to be the disparity in the reimbursements. Hoefner Decl. ¶ 16; (699–867). Numerous calls were placed to Oxford to resolve the issue. *Id.* Oxford eventually notified Biomed of the basis for its reductions on January 26, 2009.(728). On July 6, 2009, Biomed filed a written appeal of the claim reduction. (370–71). By letter dated August 3, 2009, Susan Cervero, an Oxford Claims Project Manager, informed Biomed that it had no right to appeal and that the Patient had to either appeal the determination himself or properly designate Biomed as an appeal agent. (497–502). The letter further communicated Oxford's position that the claims had been correctly processed and that "the remaining balance is the Member's cost share." (499). Biomed responded by letter, dated August 25, 2009, informing Oxford that it was appealing as the assignee of the Patient (553–54); by letter dated September 25, 2009, Oxford again denied Biomed's right to appeal (578–83). However, on September 28, 009, Rivera requested certain documentation from Biomed concerning the Patient's financial and medical status.2d Am. Compl. ¶ 68; (360–61). On April 21, 2010, Carolyn Ham, Oxford's in-house legal counsel, wrote a letter to Biomed stating, in relevant part:

> In light of the recent evidence of collection of patient responsibility and the adoption of a formal hardship policy you provided me, we will no longer be reducing any of your client's claims by an additional amount of patient responsibility. However, we believe that our past reductions for [Patient] were justified since no out of pocket maximum was ever reached so we will not be paying anything additional on past claims.

*Id.* ¶ 73 (citing Exhibit D). Oxford thereafter began paying the full amount of the Patient's claims without applying a 30% reduction. Dillon Decl. Ex. B. However, Oxford has refused to revisit the payment reductions it imposed from April 2008 to April 2010, thus leaving the Patient liable to Biomed for charges in excess of $1.5 million. Hoefner Decl. ¶ 25; Dillon Decl., Ex. B; (584).[6]

---

**6.** Specifically, Biomed alleges that Oxford reduced its payment to the Patient by at least $1,506,695.87 during the period from April 11, 2008 through April 21, 2010.2d Am. Compl. ¶ 82.

■ With this background in mind, the Court turns to Oxford's motion for summary judgment. Summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c). "The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment, and in assessing the record to determine whether there is a genuine issue as to a material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir.2004) (internal citations omitted). A plan administrator's "denial of benefits ... is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Mayers v. Emigrant Bancorp, Inc.*, 796 F.Supp.2d 434, 451 (S.D.N.Y.2011) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). "If the plan administrator has such discretion [under the terms of the plan], the benefits determination is reviewed under the arbitrary and capricious standard."

*Id.* In this case, it is undisputed that the Plan vests Oxford with "discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan." (043, 199). Thus, an arbitrary and capricious standard of review applies.[7]

As an initial matter, Oxford first asserts that some of the evidence cited by Biomed in its opposition papers and summarized above is not properly before the Court. In its reply papers—as well as in a separate motion to strike that was filed in violation of the Court's individual rules[8]—Oxford argues that the Court may not consider evidence outside of the administrative record in its review of Oxford's decision-making. *See* Defendant's Memorandum of Law in Support of its Motion to Strike Plaintiff's Improper Extra–Record Submissions ("Oxford Motion to Strike") at 1. It contends that, under the arbitrary and capricious standard of review, the Court must not consider any evidence outside of the "administrative record," which consists solely of those documents before the claims administrator at the time it made its final benefit determination. *Id.* at 2–3; *see Richard v. Fleet Fin. Group Inc. Ltd. Employee Benefits Plan*, 367 Fed.Appx. 230, 233 (2d Cir.2010).[9] According to Ox-

---

**7.** *See also Conkright v. Frommert*, —— U.S. ——, 130 S.Ct. 1640, 1646, 176 L.Ed.2d 469 (2010); *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S.Ct. 2343, 2347–48, 171 L.Ed.2d 299 (2008); *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

**8.** Counsel for Oxford never convened a joint call to Chambers to request permission to file a motion to strike. *See* Individual Rules of Practice Rule 2(b) ("In order to bring on any contemplated motion or application of any kind whatever ..., counsel for all affected parties must jointly call Chambers in the manner prescribed above.").

**9.** *See also Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir.1995) ("We follow the majority of our sister circuits in concluding that a district court's review under the arbitrary and capricious standard is limited to the administrative record. Because district courts are required to limit their review to the administrative record, it follows that, if upon review a district court concludes that the Trustees' decision was arbitrary and capricious, it must remand to the Trustees with instructions to consider additional evidence unless no new evidence could produce a reasonable conclusion permitting denial of the claim or remand would otherwise be a 'useless formality.' This rule is consistent with

ford, the Declaration of Jennifer Hoefner, the Declaration of Daniel Katzman, and Exhibits A, B, C, E, F, G, H, I, J, K, L, and N attached to the Dillon Declaration are not part of the administrative record "because the administrative record was closed at the time [Oxford] issued the EOBs [Explanation of Benefits] explaining its reimbursement for Biomed's Out–of–Network services." Oxford Motion to Strike at 3–4. Oxford therefore contends that the Court may not consider this evidence as a matter of law.[10]

Oxford then makes six additional (but largely repetitive) points. First, it argues that the deposition testimony of the three Oxford employees cannot be used to prove Biomed's alleged entitlement to benefits. *Id.* at 6. Second, it asserts that the articles submitted by Biomed, the Department of Insurance Report, and the printout from United's website should be stricken because they were not considered by Oxford in making its decision and because they are, in any event, irrelevant. *Id.* Third, Oxford contends that the correspondence between counsel for the respective parties should be stricken because these discussions did not arise until after the administrative record was closed. Fourth, Oxford maintains that the SIU notes submitted by Biomed are not part of the administrative record and "relate to an ongoing investigation of Biomed's suspicious practices of routinely granting 'hardship' waivers to Oxford members based on limited or no evidence of a financial hardship." *Id.* at 7. Fifth, Oxford asserts, as a global matter, that the information contained in Biomed's "extra record submissions" is irrelevant and thus inadmissible. *Id.* at 8–10. Final-

ly, Oxford argues that exhibit B of the Dillon Declaration should be stricken because it contains confidential information concerning the parties' settlement discussions. *Id.* at 10–11.

■ While it is true that a court's review of an ERISA claim under an arbitrary and capricious standard is generally limited to evidence in the administrative record, the court has "discretion to admit evidence outside the record upon a showing of 'good cause.'" *Puri v. Hartford Life & Accident Ins. Co.*, 784 F.Supp.2d 103, 105 (D.Conn.2011) (citing *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 631 (2d Cir.2008) ("We have repeatedly said that a district court's decision to admit evidence outside the administrative record is discretionary, 'but which discretion ought not to be exercised in the absence of good cause.'")). A demonstrated conflict of interest in the administrative reviewing body is an example of "good cause" that may, under certain circumstances, warrant the introduction of additional evidence. *DeFelice v. American Int'l Life Assur. Co.*, 112 F.3d 61, 67 (2d Cir.1997). Specifically, while a structural conflict of interest does not *per se* constitute "good cause" to consider evidence outside the administrative record, *see Locher v. UNUM Life Ins. Co. of Am.*, 389 F.3d 288, 294–296 (2d Cir.2004), "it can rise to the level of 'good cause' when bolstered by specific allegations," *Puri v. Hartford Life & Accident Ins. Co.*, 784 F.Supp.2d at 106. Additionally, the Second Circuit has determined that "good cause" exists when the procedures employed in arriving at the

the fact that nothing 'in the legislative history suggests that Congress intended that federal district courts would function as substitute plan administrators' and with the ERISA 'goal of prompt resolution of claims by the fiduciary.' ") (citations omitted).

**10.** *See e.g., Maskara v. First UNUM Life Ins. Co.*, No. 03 Civ. 498(MHD), 2004 WL 1562722 (S.D.N.Y. Jul. 13, 2004) ("The record is properly viewed as comprising all materials in the case up to the point at which the administrator made its final decision.").

claim determination were flawed, and when an insurer's claimed reason for denying a claim was not stated in its notices to the claimant. *Locher*, 389 F.3d at 295.[11]

■ The Supreme Court has held that a plan administrator operates under a conflict of interest when it both evaluates and pays benefits claims, *see Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105, 114, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008). Here, Oxford acknowledges that it "both insured benefits under the Plan and administered claims for Plan benefits." Defendant Oxford Health Plans (N.Y.), Inc.'s Memorandum of Law in Support of its Motion for Summary Judgment ("Oxford Mem.") at 1. Thus, a conflict of interest exists. Taking the evidence most favorably to plaintiff, the Court further concludes, as explained in detail below, that Oxford's decision-making process was marred by numerous procedural irregularities, including Oxford's (a) decision to twice reverse its position with respect to the Patient's benefits, (b) failure to adequately explain its claims determination, (c) refusal to hear Biomed's appeal, and (d) inconsistent treatment of similarly-situated individuals. Finally, with respect to the deposition testimony, this evidence is relevant, among other things, to the Court's determination of what evidence was in fact before the fiduciaries in making the benefits determinations at issue.[12] For these reasons (among others), the Court concludes that good cause exists in this case to consider evidence outside the administrative record.

In light of this determination, the remainder of Oxford's arguments, several of which are frivolous on their face in any event,[13] are largely moot. That said, the Court agrees with Oxford that the evidence proffered by Biomed concerning litigation unrelated to the instant action, including the reference to the Attorney

---

**11.** *See also Locher*, 389 F.3d at 296 ("In the case at hand, we hold that the District Court's finding of good cause is bolstered in part by the finding that there were insufficient procedures for internal or appellate review."); *Juliano v. HMO of N.J., Inc.*, 221 F.3d 279, 289 (2d Cir.2000) ("As a result of the failure of USH to state that absence of 'medical necessity' was a reason for the denial of benefits in its notices to the Julianos, the district court acted well within its discretion in admitting additional evidence on that issue.").

**12.** *See e.g., Black v. Pitney Bowes*, No. 05 Civ. 108(GEL), 2006 WL 3771097, at *6, 2006 U.S. Dist. LEXIS 92263, at *18 (S.D.N.Y. Dec. 21, 2006) ("On the one hand, it is inappropriate for a district court to engage in its own analysis of the merits of a denial of benefits. On the other hand, the fact that review is limited to 'the evidence that the fiduciaries themselves considered,' *Id.* at 1071, does not bar courts from determining what that evidence was. The conclusion that must be drawn from *Miller* is that in order to determine what evidence the fiduciaries considered in reaching their decision, it may be necessary to consider evidence beyond the actual documents that the administrators reviewed.").

**13.** For example, Oxford's motion to strike Exhibit B of the Dillon Declaration on the ground that it purportedly contains confidential information concerning the parties' settlement discussions is entirely without merit. Exhibit B is the April 21, 2010 email from Carolyn Hamm, Oxford's Associate General Counsel, explaining that Oxford would no longer be reducing any of the Patient's claims by an additional amount of patient responsibility. This email was sent months before the instant action was filed and cannot possibly be construed to represent an offer of settlement. Oxford does not claim that Biomed relinquished any of its rights in the instant litigation as a result of the April 21, 2010 email. *See generally* Fed. R. Evid. R. 408(a) (prohibiting evidence of "(1) furnishing or offering or promising to furnish or accepting or offering or promising to accept a valuable consideration in compromising or attempting to compromise the claim; and (2) conduct or statements made in compromise negotiations regarding the claim").

General's investigation of Ingenix, *see* Oxford Reply at 7–9, is irrelevant to the issues in this case and will therefore not be considered by this Court.

■ With this preliminary issue resolved, the Court now turns to the substance of Oxford's motion. Oxford first argues that its decision to deny Biomed's claim for additional reimbursement for covered services was not arbitrary and capricious as a matter of law. *See* Oxford Mem. at 9. Under the arbitrary and capricious standard, the claim administrator's determinations may be overturned only if they are "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir.1999). " 'Substantial evidence' is 'such evidence that a reasonable mind must accept as adequate to support the conclusion reached by the [decision-maker and] requires more than a scintilla of evidence but less than a preponderance.' " *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir.1995) (internal quotation marks omitted). Where both the claim administrator and a claimant "offer rational, though conflicting, interpretations of plan provisions, the [administrator's] interpretation must be allowed to control." *Pulvers v. First UNUM Life Ins. Co.*, 210 F.3d 89, 92–93 (2d Cir.2000).

■ In this case, Oxford argues that "Biomed's claim for additional reimbursement for covered services rendered to the Beneficiary under ERISA § 502(a)(1)(B) is inconsistent with the explicit, unambiguous terms of the Plan, and therefore, cannot be sustained." Oxford Mem. at 10. Oxford argues:

> The Certificates unambiguously state that a Beneficiary must satisfy a deductible of $1,000.00 and a coinsurance obligation of 30% of charges for Out-of-Network services until an Out-Of-Pock-

et Maximum payment has been reached. (13, 45, 167, 201). The Certificates state that "Out-of-Pocket Maximums limit the amount of Coinsurance and Deductible *you will pay* in any Plan Year. Once the Out-of-Pocket Maximum (shown in your Summary of Benefits) is reached for a Plan Year, We pay 100% of the UCR Fee Schedule for Covered Services for the remainder of that year." (45, 201) (emphasis added). The Certificates also state "[t]he maximum amount *you must pay* in any Calendar Year for Out-of-Network Covered Services is $2,500.00 for an individual and 2.5 times per family." (14, 168) (emphasis added). Oxford has interpreted these Plan terms as requiring that the Beneficiary *actually pay* the mandatory deductible and coinsurance amounts in order for the "Out-of-Pocket Maximum" to have been met.

Oxford Mem. at 10. Oxford further notes that the "Certificates consistently include the term 'pay,' rather than terms such as 'responsible for paying,' to advise Plan participants and beneficiaries that payment of these amounts must be made." *Id.* Accordingly, because the plain meaning of the Plan is unambiguous, Oxford asserts, Oxford's reasonable interpretation of its terms should not be disturbed. *Id.*

The Court disagrees. Oxford's interpretation of the word "pay" does not accord with the dictionary definition of the term or the common-sense understanding of its usage. *See Critchlow v. First UNUM Life Ins. Co. of Am.*, 378 F.3d 246, 256 (2d Cir.2004) ("We interpret ERISA plans in an ordinary and popular sense as would a person of average intelligence and experience."). Merriam–Webster defines the word pay to mean, *inter alia*, "to make due return to [the payee] for services rendered or property delivered," and "to discharge indebtedness for." *See* Merriam–Webster (2011), http://www.merriam-

webster.com (last visited October 19, 2011). In this case, the Court has already determined that the Patient validly assigned all of his rights under the Plan to Biomed and authorized Biomed to pay Oxford directly.[14] Oxford, in turn, has paid Biomed directly for claims submitted by Biomed on the Patient's behalf without objection since October 2007. Hoefner Decl. ¶ 6; Katzman Decl. ¶ 12. Under these circumstances, it defies common sense for Oxford to argue that payment rendered by Biomed, the Patient's valid assignee, on behalf of the Patient does not constitute "payment" under the terms of the Certificate. By authorizing his assignee under the Plan to pay his maximum coinsurance obligation of $2,500 per year, the Patient "ma[de] due return for services rendered" by Oxford and "discharge[d] [his] indebtedness" under the terms of the Plan.

Moreover, the Plan does not specially define the words "pay" or "payment," and Oxford never communicated its more limited understanding of those terms to either the Patient or Biomed. Nor does the Plan contain any language expressly prohibiting out-of-network providers from granting hardship waivers or explaining that a patient's receipt of such a waiver will be deemed by Oxford a "failure to pay" the patient's share.[15] "[W]here the administrator imposes a standard not required by the plan's provisions, or interprets the plan in a manner inconsistent with its plain words, its actions may well be found to be arbitrary and capricious." *McCauley v. First Unum Life Ins.*, 551 F.3d 126, 133 (2d Cir.2008). In this case, where Oxford interpreted the Plan in a manner inconsistent with the common understanding of its terms and failed to warn the Patient that payment by his valid assignee would be deemed no payment at all, the Court cannot conclude that Oxford's actions were not arbitrary and capricious. Thus, even disregarding all of the other evidence submitted by Biomed in this case and focusing exclusively on Plan's provisions, the Court cannot grant Oxford summary judgment on the ground that its interpretation of the Plan was reasonable and supported by substantial evidence.

The additional evidence cited by Biomed further supports the Court's conclusion in this regard. This evidence suggests that Oxford has no uniform policy or practice with respect to financial hardship waivers. Prior to April 2008, Oxford paid the full amount of the claim to Biomed and its predecessor Access, notwithstanding the fact that both entities had granted the Patient a financial hardship waiver. *See* Hoefner Decl. ¶ 8. From early 2008 to April 2010, Oxford changed course, reducing its payments to Biomed by 30%. *Id.* ¶ 19. In April 2010, Oxford again reversed

---

**14.** *See* 02/17/11 Memorandum Order; 2d Am. Compl. Ex. A at Biomed 00123 ("You may request Us to make payment directly to you or to the provider. If you want Us to pay the provider directly (referred to as assignment), you must give the provider a blank claim form to be completed and forwarded with the itemized bill."); 2d Am. Compl. Ex. C ¶ 5 ("I hereby assign to Biomed Pharm Inc. or its legal representative, all of my rights, including the right to sue on my behalf or name, under policy number [ ] issued by Oxford, to recover damages for services rendered by Biomed Pharm Inc.").

**15.** It is manifestly not true, as Rivera claimed in an August 12, 2009 letter to the New York Insurance Department, that Oxford's "benefit contracts our benefit contracts explicitly exclude coverage for any out-of-network services for which the provider waives the coinsurance, co-payments, or deductibles." (339). Oxford has cited no language in the Plan that could be construed to expressly prohibit financial hardship waivers by out-of-network providers. Instead, Oxford relies on its assertion, which the Court has found to be untenable, that the word "pay" somehow precludes payment by a valid assignee.

itself and began paying the full amount to Biomed, while at the same time refusing to revisit its reductions from 2008 to 2010. *See* Dillon Decl. Ex. B. Indeed, Oxford's decision to resume full payment "[i]n light of the recent evidence of collection of patient responsibility and the adoption of a formal hardship policy" demonstrates that Oxford, contrary to its position in the instant briefing, did not treat such waivers as being categorically barred. Oxford's decision to continue to pay claims for the five to eight other Biomed patients who had also received hardship waivers lends further support for this conclusion. The Court agrees with Biomed that such inconsistency and subjectivity may well be arbitrary and capricious. *See, e.g., Mead v. ReliaStar Life Ins. Co.,* No. 2:05–cv–332, 2008 WL 850675, at *3, 2008 U.S. Dist. LEXIS 28908, at *8 (Dist.Vt. Mar. 27, 2008) ("interpreting [the plan] inconsistently may be arbitrary and capricious"); *Haisley v. Sedgwick Claims Mgmt. Servs.,* 776 F.Supp.2d 33, 49 (W.D.Pa.2011) ("a plan administrator's inconsistent treatment of the same facts should be viewed with suspicion"); *Reiherzer v. Shannon,* 581 F.2d 1266, 1273 (7th Cir.1978) ("inherently inconsistent" benefits determinations "indicate arbitrary action by the plan's trustees").

Additionally, the Court's conclusion that Oxford acted under a conflict of interest is relevant to its evaluation of Oxford's decision. In *Metropolitan Life Insurance Co. v. Glenn,* 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008), the Supreme Court determined that "an ERISA-fund administrator that 'both evaluates claims for benefits and pays benefits claims' is conflicted, and … a district court, when reviewing the conflicted administrator's decisions, should weigh the conflict as a factor in its analysis." *Durakovic v. Building Service 32 BJ Pension Fund,* 609 F.3d 133, 138 (2d Cir.2010) (quoting *Glenn,* 554 U.S. at 111, 128 S.Ct. 2343). As the Supreme Court explained, "[t]he conflict … should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision." *Glenn,* 554 U.S. at 117, 128 S.Ct. 2343 (citation omitted). In this case, as already indicated above, Oxford was indisputably conflicted. Oxford's decision to reduce its payments by 30% resulted in a savings to Oxford of over $1.5 million during the period in question. The cost-savings that accrued to Oxford as a result of its decision is precisely the kind of conflict of interest which the Second Circuit has instructed should be taken into account in determining that "a particular decision is arbitrary and capricious." *Durakovic,* 609 F.3d at 140.

Finally, the Court notes that Oxford's arguments with respect to the legitimacy of the financial hardship waiver are premised on disputed issues of fact and thus only support the Court's conclusion that summary judgment is inappropriate. But addressing briefly the merits of Oxford's main points, Oxford contends that both Biomed and the Patient's family "refused to provide any of the financial proof that ostensibly supported the need for this waiver in the first place, the methodology used by Biomed to evaluate the waiver requests, or Biomed's billing statements reflecting the Beneficiary's cost share and/or payment received from the [Patient's] family." Oxford Mem. at 16. Oxford further asserts that it had legitimate reason to be skeptical of the Patient's purported financial hardship because the Patient's father is the president of "Solutions in Stainless, Inc.," the Plan sponsor and employer. *Id.* Biomed, however, responds that Oxford did not request any financial information from the Patient's family until September 28, 2009, long after it began cutting its payments to Biomed by 30%.

Biomed Opp'n at 18. Biomed also correctly points out that by the very act of questioning the Patient's financial status, "Oxford again contradicts itself, claiming on the one hand that [out-of-network] hardship waivers are prohibited yet complaining that it did not receive information it asserts was needed to determine the appropriateness of the waiver." *Id.* Finally, Biomed also accurately notes that Oxford has not cited any evidence to show that the Patient did not qualify for a financial hardship waiver, and that Oxford's brief itself acknowledges that Stainless is a very small company. *Id.* (citing Oxford Mem. at 14). Accordingly, Oxford's arguments concerning the financial hardship waiver are unpersuasive and do not alter the Court's conclusion that summary judgment is not warranted on this ground.

█ Oxford's second argument in support of its motion for summary judgment is that the Patient failed to exhaust administrative remedies. The Second Circuit has summarized the legal standards applicable to the exhaustion requirement under ERISA as follows:

> ERISA requires both that employee benefit plans have reasonable claims procedures in place, and that plan participants avail themselves of these procedures before turning to litigation. *See* 29 C.F.R. § 2560.503–1 (detailing requirements of claims procedures, including notification of adverse decisions within 90 days and the availability of a full and fair review of the initial determination); *see also Jones v. UNUM Life*

*Ins. Co. of Am.,* 223 F.3d 130, 140 (2d Cir.2000) (noting that "there is a 'firmly established federal policy favoring exhaustion of administrative remedies in ERISA cases'") (quoting *Kennedy v. Empire Blue Cross & Blue Shield,* 989 F.2d 588, 594 (2d Cir.1993)). Unless a "clear and positive showing" is made that it would be futile for the claimant to pursue her claim through the internal claims process, "that remedy must be exhausted prior to the institution of litigation." *Jones,* 223 F.3d 130 at 140 (internal quotation marks omitted).

*Eastman Kodak Co. v. STWB, Inc.,* 452 F.3d 215, 219 (2d Cir.N.Y.2006).

It is undisputed that the Patient himself (and/or his parents) failed to timely appeal Oxford's denial of benefits. The only pertinent question, therefore, is whether Biomed's attempts to appeal satisfied the exhaustion requirement. Oxford argues that such efforts were insufficient because Biomed was not an authorized appeal designee for the Patient's claims. *See* Oxford Mem. at 18. Even though Biomed was acting on behalf of the Patient as his assignee, Oxford cites the "Frequently Asked Questions" section on the United States Department of Labor's website for the proposition that a general assignment of benefits is insufficient to confer authority to the assignee to pursue an ERISA administrative appeal.[16] Oxford Mem. at 19–20. It further contends that under the terms of the governing Plan, Biomed may pursue an administrative appeal only if it

---

**16.** The "Frequently Asked Questions" state:

B–2: Does an assignment of benefits by a claimant to a health care provider constitute the designation of an authorized representative?

No. An assignment of benefits by a claimant is generally limited to assignment of the claimant's right to receive a benefit payment under the terms of the plan. Typical-ly, assignments are 'not a grant of authority to act on a claimant's behalf in pursuing and appealing a benefit determination under a plan. In addition, the validity of a designation of an authorized representative will depend on whether the designation has been made in accordance with the procedures established by the plan, if any.

Bernstein Decl. Ex. F.

is a properly designated appeal representative for the Beneficiary:

> You may designate a person to act on your behalf, including your healthcare Provider ("Designee") . . .
>
> [T]o authorize a Designee to act on your behalf, you must provide Us with written consent at the time your Grievance, Appeal or Complaint is submitted. Because your medical records are privileged and confidential, and We want to ensure that you wish to Appeal, each Member must submit an original signed written consent. Members who are 18 years of age or older, including a Member's spouse or children, will need to provide their own signed written consent. If the Member is a minor a written consent must be signed by the member's parent or guardian.
>
> Your Designee will only be authorized to act on your behalf and is required to comply with all of the conditions of your Certificate that would apply to you when you initiate any Grievance, Appeal or Complaint. Your Designee is not entitled to obtain any benefits or rights under your Certificate.

2d. Am. Compl. Ex. A, Biomed 000032. According to Oxford, therefore, the Patient was on notice of the steps he needed to take in order to designate Biomed as his ERISA appeal agent, but he failed to provide Biomed with the requisite form. Oxford Mem. at 21. As a result, "any assertion by Biomed that any administrative appeal would have been futile . . . is legally insufficient, because Biomed was not an authorized appeal designee for the patient and as such could not file an administrative appeal." *Id.* at 22.

Biomed responds, however, that Oxford does not cite any authority interpreting the DOL's "Frequently Asked Questions" as barring an assignee from appealing the denial of a claim. *See* Biomed Opp'n at 22. It then persuasively argues as follows:

> Oxford has confused the distinction between an "assignee" and an "authorized representative." As the DOL makes clear in the same FAQ, an "authorized representative" is a person "*acting on behalf of* a claimant with respect to a benefit claim or appeal of an adverse benefit determination." *Id.* ¶ B–1 (emphasis added). In other words, an "authorized representative" is a person, such as an attorney or patient advocate, who has been authorized by the Patient to represent him in an administrative claim and/or appeal. By contrast, an assignee is not "acting on behalf of" the Patient as his representative.
>
> Prior to filing an administrative claim and appealing the denial of the claim, Biomed received a full assignment of benefits from the Patient. (See (561) (stating "I hereby assign to Biomed Pharm. Inc. or its legal representative *all of my rights,* including the right to sue on my behalf or name, under policy number . . . issued by Oxford, to *recover charges for services* rendered by Biomed Pharm. Inc.") (emphasis added).) Accordingly, both when it filed the claim and administratively appealed, Biomed had standing to bring the claim on its own behalf. *See Alan Meda Plan v. Snell & Wilmer, L.L.P.,* No. CV–08–1002–PHX–GMS, No. CV–08–1587–PHXGMS (consolidated), [2009 WL 3132932, at *6] 2009 U.S. Dist. LEXIS 89334, at *21 (D.Ariz. Sept. 28, 2009) ("An assignee succeeds to the same legal rights the assignor had, *with the assignee able to act on its own behalf as if it was the assignor.*") (emphasis added); *cf. Cayuga Constr. Corp. v. United States,* No. 91 Civ. 4883(LAP), [1994 WL 392233, at *2 n. 3] 1994 U.S. Dist. LEXIS 10252, at *6 n. 3 (S.D.N.Y. Jul. 26, 1994) ("[defendant], as assignee, is pros-

ecuting the claim on its own behalf."). Because Biomed was an assignee with its own rights, there was no need for it to submit an "authorized representative" form.

. . .

Oxford also argues that the Plan requires Biomed to submit a "Designated Representative" form in order to administratively appeal the claim. (Oxford Br. 20–21.) That is not what the Plan says. The Plan merely states that written consent is to be submitted when a "Designated Representative" files an appeal. Nowhere does the Plan say that *only* a "Designated Representative" can appeal a claim, and nothing in the Plan prohibits assignees like Biomed from appealing claims. As the Plan makes clear, the "Designee" is a person "authorize[d] . . . *to act on [the patient's] behalf*" (Dkt. 40-5, at (32) (emphasis added)). Biomed was not required to appeal as the Patient's Designee. Rather, once the assignment of rights occurred, Biomed had standing to bring the claim and to appeal the denial of the claim on its own behalf. Oxford's "Designated Representative" form was not required.

Biomed Opp'n at 22–24 (footnotes omitted). The Court agrees. Because "[a]n assignee succeeds to the same legal rights the assignor had., with the assignee able to act on its own behalf as if it was the assignor," *Alan Meda Plan v. Snell & Wilmer, L.L.P.,* No. CV–08–1002–PHX-GMS, No. CV–08–1587–PHXGMS (consolidated), 2009 WL 3132932, at *6, 2009 U.S. Dist. LEXIS 89334, at *21 (D.Ariz. Sept. 28, 2009), Biomed was able to act on its own behalf in appealing Oxford's decision. Accordingly, Biomed was not required to submit either an "authorized representative" or "designated representative form."

Given that Biomed was acting on its own behalf and not as the Patient's "authorized appeal designee," the next question is whether Biomed exhausted its administrative remedies. As recounted above, Biomed filed a written appeal of the claim reduction on July 6, 2009. (370–71). By letter dated August 3, 2009, Oxford informed Biomed that it had no right to appeal and that the Patient had to either appeal the determination himself or properly designate Biomed as an appeal agent. (497–502). Biomed responded by letter, dated August 25, 2009, informing Oxford that it was appealing as the assignee of the Patient (553–54); by letter dated September 25, 2009, Oxford again denied Biomed's right to appeal (578–83). Thus, Biomed has demonstrated that Oxford denied Biomed's right to appeal and that further attempts to exhaust would have been futile. *See Barnett v. IBM Corp.,* 885 F.Supp. 581, 588 (S.D.N.Y.1995) ("[T]he futility exception is applied in a context in which there has been, in some form, an unambiguous application for benefits and a formal or informal administrative decision denying benefits and it is clear that seeking further administrative review of the decision would be futile.").

In sum, Oxford has not demonstrated it is entitled to summary judgment on either of the grounds raised in its motion. The Court finds that genuine issues of material fact exist with respect to whether Oxford's decision to deny Biomed's claim for additional reimbursement for covered services was arbitrary and capricious and whether administrative remedies were appropriately exhausted. The Court therefore reaffirms its denial of Oxford's motion for summary judgment.